**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| CONTROL TECHNOLOGY & SOLUTIONS, LLC,<br><br>       Plaintiff,<br><br>       vs.<br><br>OMNI ENERGY PARTNERS, LLC, *et al.*,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 4:21-cv-0686-MTS

**MEMORANDUM AND ORDER**

This matter is before the Court on the parties' cross-motions for summary judgment: Plaintiff Control Technology & Solutions, LLC ("CTS" or "Plaintiff")'s Motion for Partial Summary Judgment, Doc. [107], and Defendants Omni Energy Partners, LLC, Mark Graves, Scott Graves, Jim Thurman, Brandon Little, and Ryan Moats (together, "Defendants")'s Motion for Summary Judgment, Doc. [113]. Also before the Court is Plaintiff's Motion to Exclude Testimony from Defendants' Experts Douglas Sparr and David Weiner. Doc. [110]. Each Motion is fully briefed and ready for decision. For the reasons that follow the Court will grant CTS's Motion to Exclude and will deny CTS's Motion for Partial Summary Judgment, as well as Defendants' Motion for Summary Judgment.

**I.      BACKGROUND**[1]

CTS is an energy service company ("ESCO") that has provided energy-saving solutions for both public and private sector clients since 2001. Doc. [129] ¶ 1. CTS reviews its clients' energy consumption habits and designs various ways to increase their energy efficiency. *Id.* ¶ 2.

---

[1] Unless otherwise stated, the following facts are properly supported and uncontroverted pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Rule 4.01(E) of the Eastern District of Missouri Local Rules.

To do so, CTS meets with its clients, ascertains their needs, and develops a plan to execute any required work. *Id.* ¶ 3. Such development work can take up to a year to complete, during which time CTS will—at its own cost—obtain drawings, building plans, subcontractor bids, supplier costs, and assist its clients in identifying sources of potential funding for their respective projects. *Id.* ¶¶ 4, 6, 8.

For public-sector clients, this work also includes navigating the public-bid process and ensuring regulatory compliance. *Id.* ¶ 9. Before the start of any actual construction or installation work, however, public-sector clients will issue requests for proposals ("RFPs") to solicit bids from various ESCOs to complete the anticipated projects. *Id.* ¶¶ 10–11. And if an ESCO like CTS is involved in the creation of an RFP, CTS estimates that it has an 80–85% better chance of submitting the winning bid and signing a contract for the project. *Id.* ¶ 10.[2] In the context of school-district projects, contracts are generally awarded after a respective school board votes to select a specific bid. Doc. [126] ¶¶ 26, 34, 43, 53.

### A. The Individual Defendants[3]

CTS employed Defendant Mark Graves for almost fifteen years before he resigned on December 16, 2020. Doc. [129] ¶ 16. The parties disagree about his precise job title, but by his own admission, Defendant Mark Graves worked in public-sector sales, including projects related to "K-12 [schools], community colleges, and [Illinois] local government." Doc. [132-2] at 3. He is an owner and one of the founding members of Defendant Omni Energy Partners, LLC ("Omni Energy"). Doc. [129] ¶ 20. Similarly, CTS employed Defendant Thurman until his resignation on January 08, 2021. *Id.* ¶ 21. He was a CTS shareholder as well as its Director of Engineering

---

[2] Defendants dispute this figure. *Id.* ¶ 10 Response.

[3] The Court refers to Defendant Mark Graves, Defendant Scott Graves, Defendant Jim Thurman, Defendant Brandon Little, and Defendant Ryan Moats, together, as the "Individual Defendants."

before helping to found Omni Energy and serving as its President.  *Id.* ¶¶ 23–27.  Defendant Little worked at CTS from January 2017 until February 08, 2021, as a project developer.  He is now Omni Energy's Director of Operations and Development.  *Id.* ¶¶ 28–31.

CTS employed Defendant Scott Graves from January 27, 2020, until December 31, 2020, as "an account executive in business development."  He left CTS to work for Omni Energy and is a current owner.  *Id.* ¶¶ 33–37.  Finally, Defendant Moats worked at CTS for over four years until he resigned on May 04, 2021.  At CTS, Defendant Moats worked under Defendant Thurman as a project engineer and was also a CTS project manager.  *Id.* ¶¶ 38–40.  He is now an account executive at Omni Energy.  *Id.* ¶ 41.

### B.  Starting Omni Energy

Sometime in the summer of 2020, Defendants Mark and Scott Graves began to consider leaving CTS to start their own company.  *Id.* ¶ 44.  Defendant Thurman had similar ambitions.  *Id.* ¶¶ 47–48.  Text messages between Defendant Mark Graves and Defendant Thurman in July 2020 show that they were planning a joint venture.  *Id.* ¶ 49.  At the same time, Defendant Mark Graves reached out to Defendant Little regarding possible future employment.  *Id.* ¶¶ 50–51.  By November 2020, Defendants Mark and Scott Graves had taken additional, more concrete steps to plan and prepare for Omni Energy's creation, including soliciting start-up advice from entrepreneurs, interviewing potential accountants, and meeting with attorneys to assist with the creation of a limited liability company.  *Id.* ¶¶ 54, 56, 62.  Records show that Omni Energy was organized as a Delaware Limited Liability Company on December 10, 2020, and it was registered to do business in Illinois on January 30, 2021.  Doc. [109-78].

1.  School District Interactions

Meanwhile, certain Defendants interacted with school-district officials.  On September 15, 2020, Defendant Mark Graves informed Todd Hellrigel, the superintendent of Midwest Central School District ("Midwest Central"), that he planned to leave CTS.  Doc. [129] ¶ 52.  Similarly, in October 2020, Defendant Mark Graves and Defendant Thurman met with the superintendent and board president of the Salem School District ("Salem") "to see if [the district] would be open to working with the new company."  *Id.* ¶ 144.  By December 2020, Defendant Mark Graves had notified leaders at several additional school districts that he intended to leave CTS, including Havana, Triad, Lakeland, Villa Grove, Tolono, Waterloo, North Greene, and High Mount.  *Id.* ¶¶ 64–65.

Further, while employed at CTS, Defendant Mark Graves helped prepare RFPs for both Midwest Central and Salem, and the districts published them soon after his resignation.  *Id.* ¶¶ 70, 77–78, 92, 100–102, 150.  He did not notify CTS that he was performing this work.  *Id.* ¶¶ 77, 124.  Defendant Mark Graves began discussing the Midwest Central project with district officials in July 2020.  *Id.* ¶ 78.  In August 2020, he created an online Dropbox account for both Midwest and Salem, and he gave account access to Defendant Thurman and Defendant Scott Graves via their personal email accounts because he wanted to "refrain from using CTS email on these two accounts."  *Id.* ¶¶ 81–82.  Correspondence with Defendant Mark Graves indicates that, in November 2020, Defendant Thurman was tasked with drafting portions of Salem bid documents.  *Id.* ¶ 139.[4]  Both CTS and Omni Energy responded to the Midwest Central and Salem RFPs that Defendant Mark Graves helped prepare, and Omni Energy won both of the corresponding

---

[4] Although this correspondence mentions Defendant Little, he denies assisting with the Salem RFP in any way, and he asserts that he had no knowledge of it until its publication.  *Id.* ¶ 146.

- 4 -

contracts by unanimous school-board vote.  *Id.* ¶ 117; Doc. [126] ¶¶ 26, 43.[5]  Omni Energy netted a profit of $626,946 from the Midwest Central contract, Doc. [129] ¶ 117, and a profit of $1,663,317 from the Salem contract, *id.* ¶ 157.

Several Defendants also interacted with officials from Tuscola School District ("Tuscola"). On November 18, 2020, Defendant Mark Graves received text messages from a school board member at Tuscola inquiring about potential ESCO project work.  *Id.* ¶¶ 158–59.  While still employed with CTS, on December 15, 2020, Defendants Mark Graves, Scott Graves, and Little met with the Tuscola superintendent and board members to discuss project work "on behalf of" Omni Energy.  *Id.* ¶ 162.  Defendant Mark Graves prepared an RFP for Tuscola, and Omni Energy won the corresponding contract for a profit of $847,000.  *Id.* ¶ 169.

2. CTS's Materials

In general, CTS stores documents, work product, and other information about specific school districts on its internal network, which employees access using individualized passwords. *Id.* ¶ 221, at 55.  CTS also required its employees to acknowledge a sweeping policy that designated CTS's records and information—as well as that of "any related companies and/or customers"—as confidential and prohibited their removal or disclosure without CTS's permission.  *Id.* ¶¶ 220–21; Doc. [109-21]; Native Exhibit K at 24–25, 75–76.

Notwithstanding these provisions, certain Individual Defendants collected and downloaded materials from CTS to take with them to Omni Energy.  Defendant Mark Graves emailed Salem architectural drawings to his personal email account.  *Id.* ¶ 213; Doc. [109-64].  He also populated an external flash drive with historical bid materials related to past CTS projects.  Doc. [129] ¶¶ 205,

---

[5] CTS's Midwest Central submission, however, was untimely.  Doc. [126] ¶¶ 19–20, 22–24. In sworn testimony, Superintendent Hellrigel states that Midwest Central did not consider CTS as a potential contractor for this work because CTS's untimely submission disqualified it.  Doc. [115-3] ¶ 12.

210.  Defendant Scott Graves gathered CTS PowerPoints, plans, and specifications for future use. *Id.* ¶ 208.  Defendant Little saved similar materials to a thumb drive, although the parties dispute whether he collected these materials for CTS-related work or for Omni Energy.  *Id.* ¶ 207 and Response.  Defendant Moats offered to pass additional CTS materials along, *id.* ¶ 197, but the parties dispute whether and to what extent any of the other Defendants accepted his offer, *id.* ¶¶ 198–99 and Responses.

Discovery indicates that Omni Energy has been in possession of several CTS excel spreadsheets, including CTS's "pipeline document that identifies CTS business leads and prospects in Southern Illinois," *id.* ¶ 204; Doc. [109-1] ¶ 21; Doc. [109-55]; Native Exhibit R.20, as well as CTS's Illinois Project Contractor List, which outlines and comments upon specific contractors that CTS has used in projects throughout Illinois, Doc. [129] ¶ 216; Doc. [109-1] ¶ 29; Doc. [109-68]; Native Exhibit R.33.[6]  In addition, although disputed, CTS asserts that similarities between its documents and those subsequently prepared and published by Omni Energy shows that Defendants have copied CTS's documents and use them as templates when making presentations and submissions to Omni Energy's current and potential clients.  Doc. [129] ¶ 217.

## C. Procedural History

In response to the foregoing, Plaintiff initially filed this action in the Circuit Court of St. Louis County.  Plaintiff's state-court Petition sets forth nine counts, including: (1) Trade Secret Misappropriation in Violation of the Missouri Uniform Trade Secret Act ("MUTSA"); (2)

---

[6] Defendants primarily object to these statements of fact for lack of foundation because Plaintiff has not established "how or when the documents were created or who generated the documents."  Doc. [129] ¶ 216 Response.  But the affidavit of Albert Willis, CTS's Vice President, supplies the requisite foundation because it indicates that he would— at least by virtue of his position—have personal knowledge of the relevant documents and their use within CTS.  *See* Fed. R. Civ. P. 56(c)(4) (requiring affidavits to be "made on personal knowledge"); *see also El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995) (requiring affidavits made on personal knowledge to "include enough factual support to show that the affiant possesses that knowledge"); *cf. Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (explaining that the relevant standard is whether summary judgment evidence "*could* be presented at trial in an admissible form").

- 6 -

Missouri Common Law Unfair Competition; (3) Unjust Enrichment; (4) Tortious Interference with Business Expectancy; (5) Breach of Duty of Loyalty; (6) Injurious Falsehood; (7) Common Law Copyright Infringement; (8) Conspiracy; and (9) Temporary Restraining Order and Preliminary and Permanent Injunction.  Doc. [3].

Defendants removed the action to this Court, asserting that Plaintiff's state-law claim for Common Law Copyright Infringement arose under federal law because federal courts have exclusive jurisdiction over copyright claims, and the Copyright Act completely preempts the field. Doc. [1] ¶ 23; *see* 28 U.S.C. § 1331; *see also* 17 U.S.C. § 301(a).  The Court exercised federal question jurisdiction over Plaintiff's copyright claim and exercised supplemental jurisdiction over Plaintiff's other state-law claims.  Doc. [24] at 3; 2021 WL 5232226, at *2 (citing 28 U.S.C. § 1367(a)).[7]  Now, Plaintiff seeks partial summary judgment against Defendants, "as to liability only," on its claims for trade secret misappropriation, unfair competition, unjust enrichment, breach of the duty of loyalty, and conspiracy.  Doc. [107].[8]  In addition, Plaintiff moves to prohibit two of Defendants' experts from offering opinions in this matter pursuant to Federal Rule of Civil Procedure 37 because Defendants failed to follow the requirements of Federal Rule of Civil Procedure 26(a).  Doc. [110].  For their part, Defendants move for summary judgment on all of Plaintiff's claims.  Doc. [113].  The Court addresses each Motion in turn.

---

[7] The Court has continued to exercise supplemental jurisdiction over these claims after summarily granting Plaintiff's unopposed Motion for Leave to Voluntarily Dismiss.  Doc. [27]; *see* 28 U.S.C. § 1367(c)(3) (permitting—but not requiring—district courts to decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction").

[8] By consent of the parties, the Court has also dismissed Plaintiff's claim for Injurious Falsehood without prejudice. Doc. [106].

## II.   LEGAL STANDARD

### A. Discovery Sanctions for Failure to Disclose

"A party must disclose to the other parties the identity of any witness it may use at trial to present [expert testimony]." Fed. R. Civ. P. 26(a)(2)(A). "[T]his disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony." *Id.* at 26(a)(2)(B). The Federal Rules authorize certain sanctions if a party fails to abide by these requirements. Specifically, when a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* at 37(c)(1).

As interpreted by the U.S. Court of Appeals for the Eighth Circuit, this exclusion-of-evidence sanction is the "default, self-executing sanction for the failure to comply" with Rule 26(a)'s disclosure requirements unless the nondisclosure "was 'substantially justified or is harmless.'" *Goosen v. Minn. Dep't. of Transp.*, 105 F.4th 1034, 1039 (8th Cir. 2024) (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 705 (8th Cir. 2018)). The non-disclosing party bears the burden to demonstrate that either of the two exceptions apply. *See Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999); *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Additionally, it is the non-disclosing party's burden to argue that its failure deserves "some lesser sanction" other than exclusion. *Vanderberg*, 906 F.3d at 705 (citation omitted)

### B. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

- 8 -

entitled to judgment as a matter of law." "The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011) (en banc)); *accord* Fed. R. Civ. P. 56(c)(1). Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

When parties file cross-motions for summary judgment it "does not . . . have the effect of submitting the cause to a plenary determination on the merits." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) (citation modified). When reviewing cross-motions for summary judgment, and where the parties' version of events differ, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation modified); *accord Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023).

III.    DISCUSSION

   A. Plaintiff's Motion to Exclude

Plaintiff contends that two of Defendants' retained experts, Douglas Sparr and David Weiner, must be prohibited from providing testimony in this case because Defendants failed to provide expert reports as required by Rule 26(a)(2)(B). Doc. [110] ¶¶ 4–5. Plaintiff argues that Defendants' failure is neither harmless nor justified, so Rule 37(c)'s default, self-executing sanction should be in effect. *Id.* ¶¶ 3, 6–7. Defendants do not dispute that they have failed to provide expert reports as required, nor do they dispute Plaintiff's contention that their failure has

been harmful or even argue for a lesser sanction.   Instead, Defendants assert that their nondisclosure was substantially justified due to deficiencies in Plaintiff's own expert production. Doc. [119] at 1–2.  Defendants contend that, because they lack certain documents and underlying data, their experts cannot meaningfully review and possibly challenge Plaintiff's expert's methodology or damages calculations.  *Id.* at 2.  As Defendants tell it, their "experts' hands are tied, and they cannot provide a meaningful analysis without reviewing the documents that [Plaintiff's expert] reviewed [or] relied on in forming his opinions."  *Id.* at 3.

Defendants have failed to show that their nondisclosure was substantially justified under the circumstances.  Discovery in this case has been quite prolonged.  The Court's initial Case Management Order set an October 17, 2022, discovery deadline.  Doc. [34]  But after multiple subsequent extensions, discovery closed on June 30, 2025.  The operative Case Management Order required the parties to raise discovery disputes "in a diligent and timely manner" and, in any event, no later than July 07, 2025, "absent a showing of excusable neglect."  Doc. [83] at 2; *see* Fed. R. Civ. P. 6(b) (setting an excusable-neglect standard for past-due deadlines); *see also Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010) (excusable-neglect standard).  Defendants' attempt to justify their nondisclosure based on a discovery dispute that they failed to timely raise is unavailing, especially where they make no attempt to establish excusable neglect for their failure.

Even setting timeliness aside, a party's discovery obligations generally operate independently from those of his or her opponent.  A litigant is not permitted to "withhold discovery information until it has obtained to its own satisfaction discovery from an opposing party."  *BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.*, 0:04-cv-2957-PJS-JJG, 2006 WL 8443283, at *1 (D. Minn. Aug. 7, 2006); *accord Loc. Union No. 40 of the Int'l Ass'n of Bridge v. Car-Wi Const.*,

88 F. Supp. 3d 250, 272 (S.D.N.Y. 2015) ("[O]ne party's noncompliance with discovery requirements does not excuse the other's failure to comply."); *cf. Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) ("[D]iscovery is not conducted on a 'tit-for-tat' basis."). Here, Defendants were required to provide reports for Douglas Sparr and David Weiner pursuant to Rule 26(a)(2) "no later than June 15, 2025." Doc. [83]. They did not do so, nor did they seek additional time to do so. Neither perceived nor real deficiencies in Plaintiff's expert disclosures render Defendants' failure substantially justified under Rule 37(c).[9] Thus, Rule 37(c)'s "default, self-executing sanction" is in effect. *Goosen*, 105 F.4th at 1039.

### B. Plaintiff's Motion for Partial Summary Judgment

The Court proceeds to Plaintiff's Motion for Partial Summary Judgment. Because Plaintiff bears the burden of proof for its claims at trial, Plaintiff's summary judgment burden is not insignificant. *See, e.g.*, *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 489 (6th Cir. 2024) (describing a "higher" initial summary judgment burden); *accord Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (observing that such a movant "faces a challenge more difficult than otherwise"); *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) (acknowledging that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so").

---

[9] Indeed, the deficiencies that Defendants raise are issues properly addressed during the expert-discovery period, discussed in an opposing expert's timely filed report, or raised in a timely filed *Daubert* motion. *See, e.g.*, *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 645 (S.D. W. Va. 2013) ("[I]n addition to attacking the substance of an expert's opinions, a counter-expert may also opine on the unreliability of the data on which an expert's opinions is based."); *Noel v. BP Expl. & Prod., Inc.*, 346 F.R.D. 139, 145 (S.D. Ala. 2024) ("The parties had . . . [an] obligation to challenge or bolster experts, expert data, expert methodologies, and expert opinions during *expert discovery in this action*."); *Asarco LLC v. Nl Indus., Inc.*, 106 F. Supp. 3d 1015, 1023 (E.D. Mo. 2015) ("The purpose of a *Daubert* motion is to ensure that only reliable and relevant expert testimony is presented to a jury."). The Court notes that Defendants elected not to file a motion to exclude Plaintiff's expert testimony.

To carry its burden, Plaintiff "must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing." *Stephen Gould Corp. v. Buckeye Int'l, Inc.*, 4:22-cv-0771-MTS, 2024 WL 4103638, at *1 (E.D. Mo. Sept. 6, 2024) (quoting 10A *Wright & Miller's Federal Practice & Procedure* § 2727.1 (4th ed.)); *accord Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (explaining that, when the movant carries the burden of proof at trial, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense" (internal quotations omitted)). If successful, the burden then shifts to Defendants to "produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial." *Buckeye*, 2024 WL 4103638, at *2 (quoting *Celotex Corp.* 477 U.S. at 331 (Brennan, J., dissenting)). The Court addresses each claim for which Plaintiff seeks partial summary judgment below.[10] Doc. [107].

1.  *Unjust Enrichment, Duty of Loyalty, and Conspiracy*

As an initial matter, Plaintiff's summary judgment briefing is woefully insufficient to "show" that it is "entitled to judgment as a matter of law" on its claims for breach of the duty of loyalty, unjust enrichment, and conspiracy. *See* Fed. R. Civ. P. 56(a). Plaintiff's argument on these claims is limited to two short paragraphs apiece. For each one, Plaintiff cites a single case or a single string of cases to "lay out the elements of its claim." *Buckeye*, 2024 WL 4103638, at *1; *see* Doc. [108] at 13–14, 19–20. And to show that the facts of this case establish each respective element of those claims, Plaintiff provides just <u>one</u> citation to the record across all three sections; that is, Plaintiff includes a single citation to its <u>entire</u> summary judgment record—all

---

[10] Because the Court finds that a hearing is unnecessary to resolve the present Motions, the Court will also deny Plaintiff's request for a hearing, Doc. [111]. *See McCormack v. Citibank, N.A.*, 100 F.3d 532, 541 (8th Cir. 1996) ("A district court is not always required to hold oral argument before granting a motion for summary judgment under Fed. R. Civ. P. 56(c).").

two-hundred-twenty-four paragraphs of its Statement of Material Facts—incorporating hundreds of pages of case documents, transcripts, and native files in one fell swoop. *See* Doc. [108] at 14; Doc. [109] (statement of material facts); Doc. [103] (native exhibits).

Plaintiff's cavalier approach to its initial summary judgment burden simply will not do. As this Court has previously observed, "[i]t is quite difficult to demonstrate a party is entitled to judgment as a matter of law where the party provides no law or law only supporting broad, rudimentary concepts." *Pinebrook Holdings, LLC v. Narup*, 4:19-cv-1562-MTS, 2022 WL 1773057, at *1 (E.D. Mo. June 1, 2022). Other district courts have admonished the movant and denied summary judgment when faced with similar circumstances. *See, e.g.*, *McCloud v. Crusader Newspaper Grp.*, 2:07-cv-0366-RL, 2009 WL 1748025, at *2 (N.D. Ind. June 18, 2009) (denying summary judgment and noting that "not only must the movant designate specific facts, but she must also cite to legal authority showing that she is entitled to judgment as a matter of law based on those facts"); *Keeley v. John's Green House, Inc.*, 6:22-cv-0721-WWB-DCI, 2023 WL 4931172, at *1 (M.D. Fla. Apr. 18, 2023) (denying summary judgment based on movant's cursory briefing); *MRG Constr. Corp. v. CBS Serv., LLC*, 3:23-cv-0241-MGG, 2024 WL 2049467, at *9 (N.D. Ind. May 8, 2024) (finding plaintiff's "vague briefing" and "underinclusive and skeletal presentation" "fails to meet its burden of showing that it is entitled to partial summary judgment").

Plaintiff's briefing on these claims impermissibly shifts onto the Court the burden of both fashioning Plaintiff's legal arguments and—in the first instance, without the benefit of party presentation—the outcome-determinative task of *applying* the law to specific facts. *See S.E.C. v. Collector's Coffee Inc.*, 537 F. Supp. 3d 497, 502 (S.D.N.Y. 2021) ("A litigant may not place upon the Court the burden of scouring the factual record to determine how a legal principle applies to the facts of his case."); *see also In re Jacoby Airplane Crash Litig.*, 2:99-cv-6073-HAA-ES, 2007

- 13 -

WL 5037683, at \*40 (D.N.J. Aug. 27, 2007) (acknowledging that the task of "marshaling the facts and the law, and providing a reasoned application of one to the other" is "quintessentially the party's (or the party's lawyer's) responsibility").  In doing so, Plaintiff has failed to carry its summary judgment burden on these claims.  *See Lopez v. City of Dallas*, 3:03-cv-2223-M, 2006 WL 1450520, at \*12 n.27 (N.D. Tex. May 24, 2006) (denying summary judgment in part where the movant's brief required the court "to determine, on its own, which facts [in the 'factual context' section] support each legal argument").  Therefore, the Court will deny Plaintiff's Motion as to its claims for breach of the duty of loyalty, unjust enrichment, and conspiracy.

2.   *Misappropriation of Trade Secrets under MUTSA*

Plaintiff's arguments regarding its trade-secrets claim are more fulsome, but genuine disputes of material fact preclude summary judgment.  To establish a claim under MUTSA, Plaintiff must show "(1) a trade secret exists, (2) [Defendants] misappropriated the trade secret, and (3) [Plaintiff] is entitled to either damages or injunctive relief."  *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. banc 2014).  A trade secret is information that  (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use," and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Mo. Rev. Stat. § 417.453.  Factors relevant to a court's trade-secret determination include:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

- 14 -

*Am. Fam. Mut. Ins. Co. v. Mo. Dep't of Ins.*, 169 S.W.3d 905, 909–10 (Mo. Ct. App. 2005) (citation modified).

Misappropriation under MUTSA "occurs in only three scenarios." *Signalpoint*, 422 S.W.3d at 322. These are "(1) when a person acquires the trade secret [with actual or constructive knowledge that the acquisition was] . . . by improper means; (2) when a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when . . . [such a person] uses it without the owner's consent." *Id.*

To support its claim, Plaintiff directs the Court to numerous pieces of correspondence and deposition testimony indicating that, without CTS's permission, several Individual Defendants collected materials that were stored on CTS's servers. Doc. [108] at 17 (citing Doc. [109] ¶¶ 42–43, 101, 113–114, 126, 135, 164–65, 199–277). The exact nature and contents of these materials is unclear because, in most instances, the documents or files mentioned are neither described, attached, nor included in the record. However, Plaintiff has filed several discrete files under seal, which, according to Plaintiff, "contain sensitive, proprietary confidential trade secret information" that "the Individual Defendants obtained, downloaded and/or emailed themselves while employed by Plaintiff." Doc. [98] ¶ 2. These include: (1) native Excel spreadsheets that have CTS's "cost-estimating information" "embedded within," (2) school-building floorplans, (3) initial estimate and preliminary analysis reports that CTS prepared for specific school districts, and (4) an RFP Response prepared by CTS. Doc. [99] at 2–3 (listing and summarizing the materials); Doc. [129] ¶ 211 (same); Doc. [109-35] ¶¶ 25, 28, 31–34, 39–40 (same). The Court concludes that these specific materials are the subject of Plaintiff's MUTSA claim. *See Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. banc 2006) ("Evidence of purported 'trade

- 15 -

secrets' must be more than general assertions [and] must be sufficiently specific to allow a determination by the court.").

To establish that these materials are trade secrets, Plaintiff submits evidence of CTS's efforts to maintain the confidentiality of its records, namely, their storage on a password-protected server, the confidentiality provisions stated in its employee handbooks, and the confidentiality disclaimer included on certain materials that CTS sends to school districts.  Doc. [108] at 16.  In addition, Plaintiff's damages expert, Albert Willis, assigns a wholesale value to CTS's proprietary materials, one that is equivalent to CTS's contract "development costs."  Doc. [118-1] at 13–14. In response, Defendants argue that Plaintiff's materials cannot be considered trade secrets because the underlying information is "readily obtainable through [public records] requests made" to Plaintiff's school-district clients.  Doc. [130] at 7.  Defendants submit affidavits from school officials to demonstrate as much.  *See, e.g.*, Doc. [115-3] ¶ 18.  Because the information at issue has been transmitted to public entities, Defendants contend that the information is now a matter "of public knowledge" that "cannot be appropriated by one as his [trade] secret."  *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 19 (Mo. banc 1966).

Plaintiff tries to sidestep this issue by asserting that its trade secrets are compilations of both publicly available and confidential materials.  Thus, even if Defendants are correct that some of the information is generally accessible, Plaintiff argues that its trade secrets remain protectable under MUTSA.  *Cf. AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) ("[T]he fact that some or even most of the information was publicly available is not dispositive of the first factor in the UTSA definition.").  Even so, Defendants put forth an additional challenge: the accuracy and relevance of Mr. Willis's valuation of CTS's purported trade secrets.  Doc. [130] at 8.

The Court concludes that material facts underpinning a trade-secret determination remain in dispute. *See Lyn-Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo. Ct. App. 1999) ("The existence of a trade secret is a conclusion of law based on the applicable facts."). First, in general, "whether a plaintiff took reasonable steps under the circumstances to maintain the secrecy of information is an issue of fact," *Gronholz v. Sears, Roebuck & Co.*, 869 F.2d 390, 393 (8th Cir. 1989), and the Court declines to conclude on this record that Plaintiff's broad confidentiality-related measures are themselves sufficient as a matter of law, especially where, as here, the password protection and employee-handbook provisions at issue ostensibly apply to *every* document and file stored on CTS's servers. *Cf. Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767, 775 (Mo. Ct. App. 2014) (acknowledging that, in this context, a court must "consider[] the relevant factors to determine whether something is a *trade secret* rather than just confidential information" (emphasis added)). Second, the school-official affidavits that Defendants submit raise colorable factual disputes regarding "the extent to which the information [at issue was] known outside of the business" and "the ease or difficulty with which the information could be properly acquired or duplicated by others." *Mo. Dep't of Ins.*, 169 S.W.3d at 909–10 (citation modified).

Third, the value of CTS's purported trade secrets, if any, remains in dispute. Although "this is only one of the factors considered by the courts in determining whether the information at issue is a trade secret, it is a factor required under the statute." *Id.* at 910 (citing Mo. Rev. Stat. § 417.453(4)(a)). "A business seeking to protect information as a trade secret must prove that it has some independent economic value, actual or potential." *Id.* Critically, Plaintiff's summary judgment evidence on this score fails to show that "the record is so one-sided as to rule out the prospect of the nonmovant prevailing." *Buckeye*, 2024 WL 4103638, at *1. True, Mr. Willis— Plaintiff's damages expert and CTS's Vice President—has assigned a value to CTS's "confidential

- 17 -

and business proprietary information."  Doc. [118-1] at 13–14.[11]  But it is not clear that his valuation is limited to the specific, purported trade secrets for which Plaintiff has submitted evidence.  Nor is it clear whether Mr. Willis has based his valuation on the relevant factors, including "the value of the information to [CTS] and [its] competitors," or "the amount of effort or money expended by [CTS] in developing the information."  *Copeland*, 198 S.W.3d at 611.  These factual issues will need to be resolved at trial.  *See Pinebrook*, 2022 WL 1773057, at *8 n.13 (recognizing a question of fact as to the "independent economic value" of purported trade secrets); *see also In re Ahern Rentals, Inc., Trade Secret Litig.*, 2:20-md-2945-BP, 2023 WL 9894292, at *3 (W.D. Mo. Nov. 8, 2023) (acknowledging that "whether . . . there is economic value derived from keeping certain information a secret" is a matter for the jury).

Finally, there remain disputes of material fact as to whether the Individual Defendants misappropriated the specific, purported trade secrets at issue.  *See Cerner Corp. v. Visicu, Inc.*, 667 F. Supp. 2d 1062, 1077 (W.D. Mo. 2009) ("Whether a trade secret has been misappropriated is a question of fact.").  For example, Defendant Little contends that he downloaded and saved CTS materials for *CTS*-related work purposes, and it is unclear whether Defendant Moats ever acquired and transmitted CTS materials to the other Defendants despite his offer to do so.  *See, e.g.*, Doc. [129] ¶¶ 197, 198 Response, 200 Response, 207 Response.  Plaintiff may well dispute the truthfulness of these assertions, but the Court cannot make credibility determinations at this stage.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Therefore, for all these reasons, the Court will deny Plaintiff's Motion as to its claim for trade secret misappropriation under MUTSA.

---

[11] The Court will assume for purposes of summary judgment that Mr. Willis's testimony can constitute sufficient evidence of the independent economic value of CTS's confidential materials, either as an expert or a corporate representative.  *See Quilty v. Fischer*, 393 S.W.3d 130, 133 (Mo. Ct. App. 2013) (recognizing that, under Missouri law, the owner of personal property can generally testify to its value).

### 3. *Unfair Competition*

Finally, Plaintiff seeks partial summary judgment on its unfair competition claim.  Doc. [108] at 17–19.  As the Supreme Court of Missouri has explained,

> Unfair competition is a form of unlawful business injury.  It consists, essentially, in passing off or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another, or in the conduct of a trade or business in such a manner that there is either an express or an implied representation to that effect.

*Nat'l Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 19 (Mo. 1972) (citation modified).[12]  The tort "aims to effect honesty among competitors by outlawing all attempts to trade on another's reputation" and it "strives to protect the buying public from deception."  *Shrout v. Tines*, 260 S.W.2d 782, 788 (Mo. Ct. App. 1953) (citation omitted).  "[T]he true test of unfair competition [is] whether the defendant's acts are such as are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions [of the applicable trade] ."  *Pan Am. Realty Corp. v. Forest Park Manor, Inc.*, 431 S.W.2d 144, 149 (Mo. 1968) (internal quotations omitted).

To that end, "one who advertises goods or services in a way likely to deceive or mislead prospective patrons to the commercial detriment of another is subject to liability for such deceptive practices."  *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64 (Mo. Ct. App. 2012).  Thus, "in order to prevail on an unfair competition claim, a plaintiff needs to show 'either actual or probable deception.'"  *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, 677 F. Supp. 3d 955, 973 (E.D. Mo. 2023) (quoting *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 277 S.W.3d 686, 693 (Mo. Ct. App. 2008)) (citation modified).

In its summary judgment briefing, Plaintiff directs the Court to three purportedly deceptive practices: (1) Defendants' use of CTS's RFP response templates such that, according to Plaintiff,

---

[12] There is no choice of law dispute between the parties.  Unless the parties dispute the matter, the Court applies the substantive law of Missouri by default.  *See BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003).

- 19 -

Omni Energy's "RFP responses were nearly identical to CTS's responses"; (2) the fact that Defendants took credit for CTS's past projects; and (3) Defendants' use of "two bound copies of Past Case Study pictures" during a presentation to a prospective school-district client. *See* Doc. [108] at 19; *see also* Doc. [129] ¶ 217 (comparing and contrasting a CTS RFP response with an Omni Energy RFP response); Doc. [103] (submitting native exhibits). *Compare* Native Exhibit R.40 (Omni Energy RFP response), *with* Native Exhibit R.41 (CTS RFP response).

A review of the RFP responses in the record shows some similarities between the two, both in terms of layout and the repeated use of certain stock images. *See id.* ¶ 217 (development timeline). *Compare* Native Exhibit R.40 at 25, *with* Native Exhibit R.41 at 21. There are also four instances where Defendants copied language from CTS and used that language for their overview section, executive summary, and certain statements within their "background" section. Doc. [129] ¶ 217. Defendants also copied CTS's disclosure-restriction provision, which seeks to prohibit the circulation of proprietary information outside the school district. *Id.* Further, Omni Energy's RFP response contains a recitation of past projects that its "team has recently completed" as well as letters of recommendation from different school-district officials praising Defendant Mark Graves "and his team" for their past work. *Id.*; Native Exhibit R.41 at 9–12.

Contrary to Plaintiff's assertions, however, the RFP responses in the record are not "nearly identical" to one another. *Contra* Doc. [108] at 19. True, there are several examples of outright plagiarism that would rightly alarm a college professor or schoolteacher, but Plaintiff fails to cite any cases where courts have imposed unfair-competition liability for similar conduct, especially where the plagiarized text amounts to several non-substantive, non-technical sentences and short paragraphs within a ninety-one-page document. *Compare* Native Exhibit R.40 at 6, 26–27, 31, 34–35, *with* Native Exhibit R.41 at 6, 22–23, 195, 135. As such, Plaintiff has not shown, "beyond

- 20 -

peradventure," *Guzman*, 18 F.4th at 160, that the above similarities would cause the "actual or probable deception" sufficient to establish an unfair competition claim, *UpCodes*, 677 F. Supp. 3d at 973.

Also, viewing the evidence in Defendants' favor, the Court cannot impose unfair-competition liability as a matter of law for Defendants' recitation of past CTS projects. Omni Energy's RFP response states that its "*team* has recently completed similar renovations with" roughly twenty school districts.  Native Exhibit R.40 at 12 (emphasis added).  Plaintiff appears to object to this statement because it does not specify that those "similar renovations" occurred while Omni Energy's "team" worked at CTS.  The problem for Plaintiff is that it has not cited any Missouri authority requiring Defendants to include that additional disclaimer.  More importantly, Plaintiff makes no argument that the Individual Defendants—that is, Omni Energy's "team"—did not, in fact, manage and complete the renovation projects that are listed, even if they did so while at CTS.  In other words, based on the evidence in the summary judgment record, a reasonable jury could conclude that Defendants have merely taken credit where credit was due.

Finally, Plaintiff makes much of the "Past Case Study Pictures" that Defendant Mark Graves intended to use "for reference" during a school-district presentation.  Doc. [108] at 19. Plaintiff directs the Court to an email in which Defendant Mark Graves describes printing two bound copies of the pictures in advance of the meeting.  Doc. [129] ¶ 165; Doc. [109-12].  But, again, Plaintiff has not included this material in the record.  Nor has Plaintiff directed the Court to any evidence in the record describing how the Individual Defendants used these pictures during the presentation, much less any evidence demonstrating that the Individual Defendants used the images to pass off CTS's services as their own or otherwise "trade on [CTS]'s reputation." *Cornucopia, Inc. v. Wagman*, 710 S.W.2d 882, 889 (Mo. Ct. App. 1986).  As it must, the Court

declines to assume as much. *See Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 910 (7th Cir. 2022) ("We will not speculate in favor of the party who moved for summary judgment."). In sum, Plaintiff has failed to show that "the record is so one-sided as to rule out the prospect of the nonmovant prevailing" on its unfair competition claim. *Buckeye*, 2024 WL 4103638, at *1. Thus, the Court will deny Plaintiff's Motion regarding its claim for unfair competition.

\* \* \*

Therefore, for all these reasons, Plaintiff has not shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on its claims, and the Court will deny Plaintiff's Motion for Partial Summary Judgment. *See* Fed. R. Civ. P. 56(a).

## C. Defendants' Motion for Summary Judgment

The Court now turns to Defendants' Motion. When a summary judgment movant would *not* bear the burden of proof on a claim at trial, the movant may "satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show[13] that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford*, 880 F.3d at 996. Defendants argue that they are entitled to summary judgment on each of Plaintiff's claims. Doc. [113]. The Court addresses each of their arguments below.

### 1. *Misappropriation of Trade Secrets under MUTSA*

The genuine disputes of material fact that precluded summary judgment in favor of Plaintiff on its trade-secrets claim above also preclude summary judgment in favor of Defendants, *see* Fed.

---

[13] "A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000); *accord Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (noting that the movant must "point to materials on file that demonstrate that the party . . . will not be able to meet that burden").

- 22 -

R. Civ. P. 56(a).  Therefore, the Court will deny Defendants' Motion with respect to Plaintiff's claim for trade secret misappropriation under MUTSA.

### 2. *Unfair Competition*

Defendants argue that Plaintiff's unfair competition claim fails because there is insufficient evidence that Omni Energy's conduct deceived its school-district clients or caused them to confuse Omni Energy for CTS.  Doc. [114] at 12.  As Defendants tell it, "by the time [Omni Energy] submitted its bids to the school districts, the relevant parties were aware that [Defendant] Mark Graves was no longer employed by Plaintiff." *Id.*  Thus, there is no indication that school-district officials were "confused about the identity of the party it was dealing with" or had a "mistaken belief" as to any of Omni Energy's services or qualifications.  *Id.* at 13.

These arguments are unavailing for several reasons.  First, Defendants fail to cite any portion of the record when making these arguments despite their burden to produce evidence negating an essential element of Plaintiff's claim or "show" that Plaintiff lacks sufficient evidence of the same. *Bedford*, 880 F.3d at 996.  Second, Defendants are incorrect that actual deception is required to state an unfair competition claim. *Contra* Doc. [114] at 13.  As explained above, "either actual or probable deception" will do. *UpCodes*, 677 F. Supp. 3d at 973.  And third, under Missouri law, an unfair competition claim is available whenever one "advertises goods or services in a way likely to deceive or mislead prospective patrons to the commercial detriment of another." *Vinson*, 371 S.W.3d at 64.  "[T]he law of unfair competition is designed to prevent commercial hitchhiking and attempts to trade on another's reputation." *Wagman*, 710 S.W.2d at 888–89.

Against this backdrop, Plaintiff has introduced evidence from which a reasonable jury could conclude that Defendants' conduct resulted in probable—if not actual—deception.  Start with Omni Energy's recitation of *its* team's accomplishments.  Native Exhibit R.40 at 12 ("Our

- 23 -

team has recently completed similar renovations with . . . .").  The Court explained above that a reasonable jury could understand this to state the work history solely of Omni Energy's *personnel* and not Omni Energy itself.  But a reasonable jury could reach the opposite conclusion.  *See Ramsouer v. Midland Val. R. Co.*, 135 F.2d 101, 106 (8th Cir. 1943) (acknowledging that summary judgment should be denied where a reasonable jury could "reach different conclusions").  By touting the Individual Defendants' CTS-related work without any added qualification, Omni Energy appears to be "trad[ing] on [CTS's] reputation," and an unfair competition claim is "designed to prevent" such conduct.  *See Wagman*, 710 S.W.2d at 888–89.

In addition, viewing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in its favor, the same can be said for Omni Energy's apparent use of reports and pictures of past, CTS-managed projects "for reference" when meeting with prospective clients. Doc. [129] ¶¶ 164–65; Doc. [109-12]; Doc. [136] ¶¶ 228–29 (listing CTS projects).[14]  *See Holt v. Schweiger Constr. Co.*, 4:07-cv-0857-REL, 2009 WL 10672254, at *9 (W.D. Mo. May 4, 2009) (finding "a risk of deception" for purposes of unfair competition where a display of past work and former-client testimonials could mislead an observer into mistakenly thinking that plaintiff performed the work while at her newly formed company rather than at her previous employer). Therefore, the Court will deny Defendants' Motion as to Plaintiff's unfair competition claim.

3. *Unjust Enrichment*

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for unjust enrichment because there is no evidence that Defendants were enriched under inequitable or unjust

---

[14] Defendants' invocation of the best-evidence rule when objecting to Plaintiff's statements of fact is unavailing.  *See* Fed. R. Evid. 1002, 1004; *see also* Doc. [129] ¶ 165 Response.  Setting aside the contents of the attachments that Defendant Mark Graves lists, the objection in no way addresses or refutes the statements that Defendant Mark Graves makes in his email.  *But see* E.D. Mo. L.R. 4.01(E) (requiring facts in dispute to be "set forth with specific citation(s) to the record" and deeming "all matters . . . admitted . . . unless specifically controverted").

circumstances.  *See* Doc. [114] at 14; *see also Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 199 (Mo. banc 2014) (setting forth the elements of an unjust enrichment claim).  As Defendants tell it, they were "entitled to compete, post-employment," so "Plaintiff cannot prevail on a claim for unjust enrichment."  Doc. [114] at 14.  The problem for Defendants is, as explained further below, it is undisputed that Defendants competed with CTS while still employed there.  *See, e.g.*, Doc. [129] ¶ 162 (Tuscola); *see also id.* ¶ 140–41, 144 (Salem), and "it is unjust for employees to retain benefits gained as a result of breaching their duties to their employer."  *Schaeffer Mfg. Co. v. Johnson*, 4:24-cv-1656-JAR, 2025 WL 1685230, at *7 (E.D. Mo. June 16, 2025) (citing *CIBC Bank USA v. Williams*, 669 S.W.3d 298, 311–12 (Mo. Ct. App. 2023)).

Defendants' second argument fares no better.  Defendants contend that, to the extent that Plaintiff's unjust enrichment claim is premised on purported benefits obtained from using CTS's trade secrets, its claim is preempted under MUTSA.  Doc. [114] at 15 (citing Mo. Rev. Stat. § 417.463.1).  This argument has some support.  *See* Doc. [29] at 5; 2021 WL 6049812, at *3.  But because genuine disputes of material fact persist and prevent a trade secret determination, "genuine issues of material fact preclude the conclusion that [Plaintiff's unjust enrichment claim is] preempted by MUTSA."  *InfoDeli, LLC v. W. Robidoux, Inc.*, 4:15-cv-0364-BCW, 2020 WL 1855285, at *3 (W.D. Mo. Feb. 26, 2020) (explaining that if the material at issue "is not a trade secret, MUTSA does not apply and does not preempt" other claims in the case).  Therefore, the Court will deny Defendants' Motion as to Plaintiff's unjust enrichment claim.

### 4.  *Tortious Interference with a Business Expectancy*

The Court next addresses Defendants' arguments as to Plaintiff's tortious interference claim.  "Under Missouri law, intentional interference with a contract or business relationship requires proof of (1) a contract or valid business expectancy, (2) defendant's knowledge of the

contract or relationship, (3) a breach induced or caused by defendant's intentional interference, (4) absence of justification, and (5) damages." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996) (Benton, J.)).  To be actionable, plaintiff must put forth "a probable future business relationship from which there is a reasonable expectancy of financial benefits." *Ozark Emp't Specialists v. Beeman*, 80 S.W.3d 882, 893 (Mo. Ct. App. 2002).  "Missouri courts have recognized that a regular course of prior dealings suggests a valid business expectancy." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 19 (Mo. banc 2012) (citation omitted).

Defendants primarily challenge the first element: whether Plaintiff had a reasonable and valid business expectancy under the circumstances.  Defendants contend that CTS had no valid business expectancy for future ESCO project work in school districts where it had no prior dealings.  Doc. [114] at 18 (discussing Tuscola).  Further, Defendants argue that CTS's preexisting relationships with other school districts—namely, Midwest Central, Salem, North Greene School District ("North Greene"), and Rossville-Alvin School District ("Rossville-Alvin")—are insufficient because any expectation that CTS had was speculative.  *Id.* at 17.

To illustrate, Defendants note that Plaintiff previously completed work for North Greene in 2017, and North Greene awarded a subsequent contract to one of CTS's competitors the following year.  *Id.*; *see* Doc. [126] ¶¶ 50–51.  After all, ESCO work occurs contract-by-contract, and "Plaintiff cannot identify any obligation [for the school districts] to retain Plaintiff for any additional work beyond an existing contract."  Doc. [114] at 17.  Defendants also gesture toward the applicable public-bid process and the fact that a school-board vote is required to award a specific contract.  According to Defendants, these circumstances render any expectancy that CTS had unreasonable.  *Id.* at 17, 19.

Defendants' arguments fall short at the summary judgment stage, particularly regarding the school districts for which Plaintiff had undertaken significant prior work.[15]  Plaintiff need not produce an existing contract or some other formal obligation to establish a valid business expectancy.  *See W. Blue Print*, 367 S.W.3d at 19.  A "probable business relationship" leading to a "reasonable expectancy" of financial gain is enough.  *Id.*  And a successful, long-standing or recurrent course of dealing can constitute sufficient evidence of a valid business expectancy, even when the business opportunities at issue are won via bid process.  *See id.* (rejecting the argument that a "competitive public bid process" precludes a valid business expectancy); *see also Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985) (applying Missouri law and finding that plaintiff had a valid business expectancy based on its long-standing customer relationship, even though business was offered "each year to all bidders").

In its opposition, Plaintiff emphasizes its pre-existing relationships with the school districts at issue.  Doc. [128] at 15.  For years prior to this lawsuit, CTS successfully completed projects and undertook development work for Salem, Midwest Central, Rossville-Alvin, North Greene, and High Mount School District ("High Mount"), including drafting five-year master plans for each. Doc. [136] ¶¶ 233–37.  The Court is skeptical that the completion of one or two past projects, *see, e.g.*, Doc. [109-7] at 43 (describing the "one and only project for CTS" at Midwest Central), and the mere furnishing of a five-year plan constitutes evidence supporting a valid business expectancy under Missouri law, especially in the context of a larger public-bid process.  *See* Doc. [126] ¶¶ 50–51 (setting forth North Greene's decision to contract with a different ESCO).  Such circumstances

---

[15] The Court is inclined to agree that, under the circumstances in this case, Plaintiff cannot base its tortious interference claim on potential project work for school districts with which Plaintiff had no prior business relationship.  As this Court has previously held, "[t]he hope of establishing a business relationship through prospective dealings with customers with whom there has been no course of prior dealings does not constitute a reasonable business expectancy." *John Beal, Inc. v. Roofpros, Inc.*, 4:16-cv-1151-CDP, 2016 WL 7439214, at *3 (E.D. Mo. Dec. 27, 2016) (citing *Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 565 (Mo. Ct. App. 1999)).

fall short of the longstanding, recurrent course of dealing that courts have deemed sufficient, and CTS's "mere hope" that a school district will elect to follow a five-year plan that CTS prepared— and that the district ultimately will contract with CTS to complete the work—is generally "not enough." *See Vilcek v. Uber USA, LLC*, 902 F.3d 815, 818 (8th Cir. 2018) (applying Missouri law) (citation modified).

That said, there is evidence in the record supporting an expectancy that was "reasonable and valid under the circumstances presented." *Id.* For example, CTS began working with Salem sometime between 2016 and 2017 to complete renovations inside its elementary school. Defendant Mark Graves was heavily involved with that project work. Doc. [129] ¶ 118–19; Doc. [109-7] at 9 (indicating that CTS controlled the applicable RFP "through" Defendant Mark Graves). He also built a strong professional relationship with Salem's superintendent and learned much about potential future projects in the district. Doc. [109-7] at 7, 9, 11. Evidence in the record suggests that this work was the first phase in a larger, five-year development plan that CTS prepared for the district—a plan that Defendant Mark Graves himself developed. *See id.* ¶¶ 119– 23; *see also* Doc. [109-5] at 8–11; Doc. [109-7] at 8–9. Although Omni Energy eventually won the contract for Salem's second phase, both phases were interrelated such that Salem arguably did not need to circulate a new RFP for phase two; that is, Salem could have proceeded with CTS under the initial phase-one contract. Doc. [109-5] at 10–11.

The Court concludes that this evidence, viewed in a light most favorable to Plaintiff, "suggests a valid business expectancy" for purposes of a tortious interference claim. *W. Blue Print*, 367 S.W.3d at 19. This is especially true where, as here, it appears that CTS's prior business relationships with the school districts at issue were based on the strength of the Individual Defendant's *own* relationships with those districts. *See id.* (finding a valid business expectancy

- 28 -

and sufficient evidence of tortious interference where defendant managed the public contract at issue "on [plaintiff's] behalf" when she was plaintiff's employee, and her competing company was ultimately awarded the contract "as a direct result of [her] actions").

Defendants make one additional argument regarding two of the school districts at issue. Even assuming Plaintiff had a valid business expectancy with respect to the Midwest Central and Rossville-Alvin contracts, Defendants assert that Plaintiff cannot prove causation.  According to Defendants, their actions could not have deprived Plaintiff of contracts with those districts because Plaintiff failed to submit a timely bid.  Doc. [14] at 17.  Thus, Defendants argue that Plaintiff's failure severed the causal chain between Defendants' conduct and Plaintiff's purported injury.  *Id.*

This argument is unavailing given the evidence in the record.  When analyzing causation for purposes of a tortious interference claim, Missouri courts apply a "but for test," which asks "(1) did the defendant actively and affirmatively take steps to induce the breach [or interfere with the expectancy]; and, if so (2) would the plaintiff's business expectancy been realized in the absence of the defendant's interference."  *Beeman*, 80 S.W.3d at 894.  And here, a reasonable jury could conclude that, "in the absence of the [Individual Defendants'] interference," Plaintiff would have placed timely bids and "realized" its expectancy.  *Id.*; *see* Doc. [136] ¶ 227 (learning from officials that any Rossville-Alvin RFP response from CTS was futile because, as a result of the Individual Defendants' conduct, the district had already decided to award Omni Energy the contract);[16] *see also, e.g.*, Doc. [129] ¶ 77 (stating that Defendant Mark Graves kept the Midwest Central project secret from CTS because he might "possibly pursue[] it").  For the same reasons, the causal chain is not severed by the mere fact that the contracts at issue were awarded via school-

---

[16] Defendants' hearsay objection to this statement of fact misses the mark because Plaintiff does not offer the statement of Rossville-Alvin's superintendent for its truth.  *See United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) ("A statement offered to show its effect on the listener is not hearsay." (collecting cases)).

board vote.  *Contra* Doc. [114] at 7–9.  Therefore, the Court will deny Defendants' Motion as to Plaintiff's tortious interference claim.

      5.   *Breach of the Duty of Loyalty*

Defendants' duty-of-loyalty arguments also fail.  "Every employee owes his or her employer a duty of loyalty."  *W. Blue Print*, 367 S.W.3d at 15 (citation omitted).  "[E]mployees, while employed, must not act contrary to the employer's interests, including engaging in direct competition with the employer until their employment is terminated."  *Id.* at 17 (citing *Trieman*, 409 S.W.2d at 41).  That said, "employees may agree among themselves to compete with their then employer upon termination of their employment," and they "may plan and prepare for their competing enterprises while still employed."  *Id.*  But "a breach arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which by definition, is to gain advantage over a competitor."  *Id.* (quoting *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 479 (Mo. banc 2005)).

Defendants assert that, although "some of the [Individual Defendants] planned and prepared for a competing enterprise while still employed with Plaintiff, . . . there is no evidence that Defendants went beyond mere planning and preparation."  Doc. [114].  The Court acknowledges that our adversarial justice system depends, in part, on the parties' "vigorous advocacy," *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1058 (1991), but Defendants vastly understate the evidence in the record.  For example, it is undisputed that Defendant Mark Graves covertly prepared RFPs and discussed future project work for multiple school districts while employed at CTS.  *See, e.g.*, Doc. [129] ¶¶ 70, 77–78, 92, 100–02, 150.

It is also undisputed that many of the Individual Defendants met with officials from several school districts to discuss project work "on behalf of" Omni Energy while they were employed at

CTS. *See id.* ¶ 162 (Tuscola); *see also id.* ¶¶ 140–41, 144 (Salem). And there is evidence in the record indicating that the Individual Defendants co-opted a business opportunity that should have been presented to CTS. *See* Doc. [136] ¶¶ 231–32. *Compare* Doc. [127-10] (showing that a Tuscola board member reached out to "the company Villa Grove used" for its recent project work when preparing future renovations in Tuscola schools), *and* Doc. [127-2] ¶ 5 ("CTS was the company that worked on Villa Grove's master project and renovation."), *with* Doc. [129] ¶ 159 (excitedly describing phone conversations with Tuscola board members about work with "our new company" despite the lack of a pre-existing relationship).

A reasonable jury could conclude that these actions, and others like them, were contrary to CTS's interests, constituted direct competition, and thus breached the Defendants' duty of loyalty. *See Scanwell*, 162 S.W.3d at 480 (holding that an employee cannot "solicit customers for [his] rival business before the end of his employment" (citing Restatement (Second) of Agency § 393, cmt. e)); *accord Synergetics*, 477 F.3d at 959 (applying Missouri law). Therefore, the Court will deny Defendants' Motion as to Plaintiff's claim for breach of the duty of loyalty.

### 6. *Conspiracy*

Defendants' arguments regarding Plaintiff's conspiracy claim fail too. Under Missouri law, a civil conspiracy claim "is not a separate and distinct action" but "acts to hold the conspirators jointly and severally liable for the underlying act." *Signalpoint*, 422 S.W.3d at 324 (internal citation omitted). A civil conspiracy requires evidence of: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [plaintiff] was thereby damaged." *W. Blue Print*, 367 S.W.3d at 22.

Defendants argue that Plaintiff cannot establish a civil conspiracy in this case because "a conspiracy is necessarily premised upon an underlying tort," and from their perspective, they are

entitled to summary judgment on all of Plaintiff's underlying torts.  Doc. [114] at 20–21.  The Court's findings above, however, foreclose this argument.[17]   Therefore, the Court will deny Defendants' Motion as to Plaintiff's civil-conspiracy claim.

       7.  *Injunctive Relief*

Finally, the Court addresses Defendants' arguments as to Plaintiff's claim for injunctive relief.  To the extent Plaintiff seeks injunctive relief premised on its trade-secrets claim, *see* Mo. Rev. Stat. § 417.455(1) (providing injunctive relief as a remedy), Defendants "reincorporate their earlier argument that the relevant materials are not trade secrets."  Doc. [114] at 21.  But, as explained above, genuine disputes of material fact preclude the Court from making such a finding, so this argument fails.  In addition, Defendants' argument that injunctive relief is unavailable at trial because Plaintiff failed to seek a preliminary injunction is unavailing.  *See Fed. Nat. Mortg. Ass'n v. Grossman*, 0:12-cv-2953-SRN-JJG, 2014 WL 4055371, at *12 (D. Minn. Aug. 15, 2014) (rejecting same).

Defendants also maintain that injunctive relief is not warranted because Plaintiff's claims for damages demonstrate "that Plaintiff has adequate remedies at law to prosecute its claims."  *Id.*  True, a plaintiff seeking injunctive relief has to show irreparable harm, and "[i]rreparable harm occurs when a party has no adequate remedy at law."  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022).  But, that Plaintiff "seeks damages on its claims is no bar to the conclusion that the remedy at law is inadequate."  *Barnes Grp. Inc. v. Rinehart*, 2:00-cv-0311-JDT-WGH, 2001 WL 301433, at *23 (S.D. Ind. Feb. 26, 2001) (Tinder, J.); *accord Meineke Franchisor SPV*

---

[17] Defendants also argue that, to the extent Plaintiff predicates its civil conspiracy claim on alleged tortious activities between the Individual Defendants and Omni Energy, Plaintiff cannot do so.  This is correct.  *See Mika v. Cent. Bank of Kan. City*, 112 S.W.3d 82, 94 (Mo. Ct. App. 2003) ("There can be no conspiracy between an agent and a principal.").  But Plaintiff is not doing so here.  *See* Doc. [3] (asserting its conspiracy claim against "the Individual Defendants").

*LLC v. Moriarty*, 1:25-cv-09239-LCJ, 2026 WL 705751, at \*4 (N.D. Ill. Mar. 13, 2026) ("That damages are available, though, does not mean the remedy at law is necessarily adequate.").

For example, monetary damages might not adequately compensate Plaintiff for harm that has already occurred, and injunctive relief can protect against future harm, at least to the extent that the harm is irreparable, *see, e.g.*, *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991), including, "actual or threatened misappropriation of trade secrets," *Synergetics, Inc. v. Hurst*, 4:04-cv-0318-DDN, 2005 WL 3358298, at \*24 (E.D. Mo. Dec. 9, 2005) (awarding both damages and injunctive relief after trial), as well as persistent unfair competition, *cf. Holt*, 2009 WL 10672254, at \*9 (entering preliminary injunctive relief based, in part, on defendant's unfair competition counterclaim). Evidence at trial could indicate that such relief is warranted. *See, e.g.*, *Synergetics*, 2005 WL 3358298, at \*24. Therefore, the Court will deny Defendants' Motion with respect to Plaintiff's claim for injunctive relief.[18]

\* \* \*

In sum, none of Defendants' arguments entitles them to summary judgment on Plaintiff's claims. As a result, the Court will deny Defendants' Motion for Summary Judgment, and it will enter a separate order setting this matter for trial.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment, Doc. [107], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Defendants' Experts Douglas Sparr and David Weiner, Doc. [110], is **GRANTED**. *See* Fed. R. Civ. P. 37(c)(1).

---

[18] Of course, Plaintiff's "claim" for injunctive relief is better understood as a prayer for a specific kind of remedy relative to its other substantive claims. *See Henke v. Arco Midcon, L.L.C.*, 750 F. Supp. 2d 1052, 1060 (E.D. Mo. 2010) (collecting cases).

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Hearing, Doc. [111], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, Doc. [113], is **DENIED**.

**IT IS FINALLY ORDERED** that Defendants' unopposed Motion for Leave to File Financial Documents under Seal, Doc. [116], is **GRANTED**.  *See* E.D. Mo. L.R. 13.05(A)(4)(h).

Dated this 22nd day of May 2026.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE